# EXHIBIT A

Second Amended Complaint

Andre Verdun (SBN 265436)
**LAW OFFICE OF ANDRE L. VERDUN**
1777 N Ventura Ave
Ventura, CA 93001
Tel.6198800110
Fax.8668040051
service@verdunlaw.com

Attorneys for Plaintiffs,
Tran Thuy Le and Tory Le

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **TRAN THUY LE, an individual; and TORY LE, an individual,**<br><br>Plaintiffs,<br>vs.<br><br>**THE TURNKEY FOUNDATION INC. doing business as ARBOR FINANCIAL GROUP, a California corporation; KIND LENDING LLC, a Kentucky limited liability company; DAVID E. ARVIDSON, an individual; STACY HUNJADI, an individual; and DOES 1 through 50, inclusive,**<br><br>Defendants. | Case No.: **3:26-cv-01570-JLS-VET**<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**<br><br>Judge: Hon. Janis L. Sammartino<br>Magistrate Judge: Hon. Valerie E. Torres<br>Action Filed: November 3, 2025<br><br>Trial Date: None set |

Plaintiffs TRAN THUY LE and TORY LE allege as follows:

THE LAW OFFICES OF: ANDRE L. VERDUN

## INTRODUCTION

1. In the summer of 2025, Tran Thuy Le and Tory Le, two sisters, set out to refinance a house that the Le family had bought for cash at 6951 Carthage Street in San Diego. Family members had pooled savings, drawn on credit, and liquidated investments to buy the house. The refinance was the plan for paying everyone back and finishing the work needed before the family could move in.

2. Defendant The Turnkey Foundation Inc., doing business as Arbor Financial Group, told the sisters on the first day that it had investors who could lend 95 percent of the value of the house at 6.625 percent with zero points. Arbor locked that rate in writing, collected the sisters' documents for two months, told the sisters that the underwriter and the mortgage insurance underwriter had reviewed the file, told the sisters that the mortgage insurance certificate would issue the next day, sent final loan documents to escrow, and had both sisters sign a promissory note, a deed of trust, a closing disclosure, and closing instructions that stated, in capital letters, that the listed funding conditions were "THE ENTIRE LIST OF FUNDING CONDITIONS." Escrow confirmed funding and recording for September 30, 2025.

3. The loan did not fund on September 30, 2025, or ever. On October 1, 2025, Arbor's loan officer wrote the reason: the loan had been entered for mortgage insurance "as rate and term and it is cash out the MI will not insure the cash out to 95% of the value." The classification error was not new, and it was not the mortgage insurer's. Arbor's own lender-completed loan application forms described the transaction as a "Limited Cash Out" refinance on July 31, 2025 and as a "No Cash Out" refinance on September 22, 2025, while Arbor's own funding conditions for the same loan called it a "CASH-OUT TRANSACTION" and Arbor's own final application showed more than Seven Hundred Thirty-Seven Thousand Dollars ($737,000.00) in cash going to the borrowers from a house

THE LAW OFFICES OF: ANDRE L. VERDUN

that had no mortgage on it. Defendant Kind Lending LLC's Lock Confirmation, dated July 31, 2025, priced the loan the same way, as a "Limited Cash-Out" refinance at 95 percent loan-to-value. Under the agency guidelines that Defendants themselves invoked, a house with no mortgage cannot be refinanced as a limited cash-out or no cash-out transaction, and a cash-out refinance of a principal residence is capped at 80 percent of value. The loan that Defendants quoted, locked, approved, documented, and had Plaintiffs sign was a loan that no mortgage insurer would insure and no investor would buy.

4. Defendants did not fund the loan Defendants had documented. Defendants offered Plaintiffs a different loan, first for Six Hundred Thirty Thousand Four Hundred Dollars and Zero Cents ($630,400.00), which is 80 percent of the value Arbor used on July 31, 2025, and then for Six Hundred Eighty Thousand Dollars and Zero Cents ($680,000.00), which is 80 percent of the appraised value, and when Plaintiffs declined to absorb the cost of Defendants' error, Defendants stopped responding. Defendants never sent Plaintiffs a written notice of adverse action or a written statement of reasons. This action seeks to hold Defendants accountable under California's law of misrepresentation and fiduciary duty, the California Financing Law, the Consumers Legal Remedies Act, the Unfair Competition Law, and the federal Equal Credit Opportunity Act.

## PARTIES

5. Plaintiff TRAN THUY LE ("Tran Le") is an individual residing in San Diego County, California. Tran Le was previously captioned in this action as "Tran Thtuy Le"; the correct spelling of Tran Le's name is Tran Thuy Le. Tran Le is not a mortgage lender, mortgage broker, loan originator, or underwriter. At all times relevant herein, Tran Le was a "consumer" within the meaning of California Civil Code section 1761(d) and an "applicant" within the meaning of 15 U.S.C. §

THE LAW OFFICES OF: ANDRE L. VERDUN

1691a(b).

6. Plaintiff TORY LE ("Tory Le") is an individual residing in the State of New York. Tory Le is Tran Le's sister and a co-borrower on the loan described herein. Tory Le is not a mortgage lender, mortgage broker, loan originator, or underwriter. At all times relevant herein, Tory Le was a "consumer" within the meaning of California Civil Code section 1761(d) and an "applicant" within the meaning of 15 U.S.C. § 1691a(b). Tran Le and Tory Le are referred to collectively as "Plaintiffs."

7. Defendant THE TURNKEY FOUNDATION INC., doing business as ARBOR FINANCIAL GROUP ("Arbor"), is a California corporation (California Secretary of State entity number 2622735) with its principal place of business at 1805 E. Garry Avenue, Santa Ana, California 92705. Arbor holds California Department of Real Estate corporate broker license number 01845041, California Financing Law license number 60DBO-43870, and Nationwide Multistate Licensing System ("NMLS") identifier 236669. At all times relevant herein, Arbor held itself out to Plaintiffs as a mortgage broker and lender, arranged the residential mortgage loan described herein with third-party investors, and was named as "Lender" on the loan documents that Plaintiffs signed.

8. Defendant KIND LENDING LLC ("Kind Lending") is a Kentucky limited liability company registered to do business in California (California Secretary of State file number 202106910987), with California offices at 1920 Main Street, Suites 1100 and 1200, Irvine, California 92614. At all times relevant herein, Kind Lending was a wholesale residential mortgage lender that underwrote, priced, locked, and made the credit decision on Plaintiffs' loan. On July 31, 2025, Kind Lending issued its own Lock Confirmation for Plaintiffs' loan under Kind Lending's letterhead and Kind Lending's loan number 7000145046, ran the loan through an automated underwriting system, set the loan amount, the

loan-to-value ratio, the note rate, and the mortgage insurance type and premium, and set the terms of each counteroffer described below. Kind Lending is a "creditor" within the meaning of 15 U.S.C. § 1691a(e) and 12 C.F.R. § 1002.2(l).

9. Defendant DAVID E. ARVIDSON ("Arvidson") is an individual residing, on information and belief, in Orange County, California. Arvidson is the chief executive officer and a co-founder of Arbor, holds California Department of Real Estate license number 01236224 and NMLS identifier 298701, and is Arbor's registered agent for service of process. Arvidson personally communicated with Plaintiffs on October 2, 5, and 6, 2025, personally transmitted the counteroffers described below, and directed, authorized, ratified, or personally participated in the acts and omissions alleged herein.

10. Defendant STACY HUNJADI ("Hunjadi") is an individual residing, on information and belief, in Orange County, California. Hunjadi was at all relevant times a licensed loan originator employed by or acting as the agent of Arbor, holding California Department of Real Estate license number 02098822 and NMLS identifier 228573, and self-described in correspondence as an "Independent Mortgage Advisor" and "Mortgage Expert for over 30 years." Hunjadi personally made the representations to Plaintiffs alleged herein. Arbor, Arvidson, and Hunjadi are referred to collectively as the "Arbor Defendants."

11. The true names and capacities of Defendants sued herein as Does 1 through 50, inclusive, are unknown to Plaintiffs. Plaintiffs are informed and believe, and on that basis allege, that each such fictitiously named Defendant is responsible for the wrongs alleged herein and that Plaintiffs' damages as herein alleged were proximately caused by the conduct of such fictitiously named Defendants. Plaintiffs will amend this Complaint to allege the true names and capacities of those Defendants when ascertained. Plaintiffs are informed and believe, and on that basis allege, that at all times relevant herein, each of the



THE LAW OFFICES OF: ANDRE L. VERDUN

The Law Offices of: Andre L. Verdun

named and fictitiously named Defendants was the agent, servant, employee, representative, joint venturer, co-conspirator, alter ego, and/or successor in interest of each of the remaining named and fictitiously named Defendants, acting within the course and scope of such agency and employment and with the permission and consent of the co-Defendants. Each Defendant ratified and approved the acts of the remaining Defendants as herein alleged.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over the Seventh Cause of Action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1691e(f), because that claim arises under the Equal Credit Opportunity Act. This Court has supplemental jurisdiction over the remaining causes of action pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same transaction and form part of the same case or controversy. This action was removed to this Court by Kind Lending on March 12, 2026 pursuant to 28 U.S.C. §§ 1441 and 1446.

13. This Court has personal jurisdiction over each Defendant. Arbor is a California corporation; Kind Lending is registered to do business in California and maintains offices in Irvine, California; Arvidson and Hunjadi reside and work in California; and every Defendant directed the conduct alleged herein at Plaintiffs in California concerning real property located in San Diego, California.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in San Diego County, the property that was to secure the loan is located in San Diego County, and Tran Le resides in San Diego County.

**STATEMENT OF FACTS**

**<u>A. The Family, the House, and the Purpose of the Loan</u>**

15. In 2025, Tran Le, Tory Le, another sister, and the sisters' parents pooled personal funds to purchase the single-family residence at 6951 Carthage

THE LAW OFFICES OF: ANDRE L. VERDUN

Street, San Diego, California 92120 (the "Property") for cash. To fund the purchase, Tran Le drew Five Hundred Thousand Dollars and Zero Cents ($500,000.00) on an investment-secured line of credit, and family members drew down savings and liquidated investments. Title to the Property was vested in Tran Le and Tory Le as joint tenants. The Property was free of any mortgage or deed of trust.

16. Plaintiffs intended to refinance the Property promptly after the purchase, to repay the line of credit and the family members who had contributed, and to pay for the renovations needed before the home could be occupied. On July 29, 2025, Plaintiffs told Hunjadi that Plaintiffs were seeking a loan to recoup the cash used to purchase the Property. The loan was sought for personal, family, and household purposes, to be secured by a one-unit residence that Plaintiffs stated on every application and affidavit would be occupied as a principal residence.

17. Plaintiffs' sister, who is not a party to this action, assisted Plaintiffs with communications during the transaction. Arbor's written communications during the transaction were addressed to Plaintiffs' sister, to Plaintiffs, or to both; each was made with the intent and expectation that it would be conveyed to Plaintiffs, and each was conveyed to Plaintiffs at or about the time it was sent. From August 18, 2025 forward, Tran Le was copied on Arbor's written communications, and from October 1, 2025 forward, Arbor wrote to Tran Le directly.

**B. Arbor Says It Has Investors for a 95 Percent Loan, Locks It, and Classifies It as a Limited Cash-Out Refinance**

18. On July 29, 2025, at approximately 9:39 a.m., Plaintiffs, through their sister, contacted Hunjadi at Arbor seeking a cash-out refinance of the Property. At 5:57 p.m. that day, Hunjadi wrote: "I have reached out to several investors and

The Law Offices of: Andre L. Verdun

we could do up to 95% on a 30 year fixed at 6.625% with zero points," adding that Hunjadi was "waiting on one other lender who can do 95% as well to confirm if they can beat 6.5%." Hunjadi signed the email as an "Independent Mortgage Advisor" with Hunjadi's and Arbor's Department of Real Estate license numbers.

19. On July 30, 2025, at approximately 7:11 a.m., in response to Plaintiffs' question about timing, Hunjadi wrote that there would be a rescission period "since it is owner occ" and that the transaction could close in approximately twenty-one (21) days. At 11:23 a.m. that day, Hunjadi introduced Plaintiffs to an escrow officer and opened escrow with Oakwood Escrow, Inc., escrow number 16239.

20. On July 31, 2025, Arbor issued initial loan disclosures and a Loan Estimate for a conventional, fixed-rate refinance in the amount of Seven Hundred Forty-Eight Thousand Six Hundred Dollars and Zero Cents ($748,600.00) at a note rate of 6.625 percent, against an estimated property value of Seven Hundred Eighty-Eight Thousand Dollars and Zero Cents ($788,000.00), a loan-to-value ratio of 95 percent, with estimated cash to the borrowers of Seven Hundred Thirty-Four Thousand Three Hundred Eight Dollars and Zero Cents ($734,308.00) and no existing mortgage to be paid off. Hunjadi represented that Arbor had "secured the rate" and was waiving its administrative fee of Nine Hundred Ninety-Five Dollars and Zero Cents ($995.00) and its processing fee of Nine Hundred Fifty Dollars and Zero Cents ($950.00) as an inducement to proceed with Arbor.

21. The same day, Arbor delivered to Plaintiffs a Lock-In Confirmation, which Plaintiffs and Hunjadi, on behalf of Arbor, each signed. The Lock-In Confirmation states a lock-in date of July 31, 2025, a lock expiration date of August 30, 2025, a loan amount of Seven Hundred Forty-Eight Thousand Six Hundred Dollars and Zero Cents ($748,600.00), a 360-month term, an interest

THE LAW OFFICES OF: ANDRE L. VERDUN

rate of 6.625 percent, zero discount points, and a conventional fixed-rate loan, and states that "we agree, subject to loan approval, to close this loan in accordance with the loan terms stated below, regardless of changes in the market interest rate, discount points, and other terms between now and the lock expiration date."

22. Also on July 31, 2025, Arbor completed the lender section of the Uniform Residential Loan Application, titled "Lender Loan Information," which is "completed by your Lender" and which Plaintiffs did not complete or sign. In that section Arbor marked the "Refinance Type" as "Limited Cash Out" and calculated "Cash From/To the Borrower" as Seven Hundred Thirty-Five Thousand Eight Dollars and Forty-Eight Cents ($735,008.48) to the borrowers. The borrower sections of the same application, which Plaintiffs signed, truthfully stated that the loan purpose was "Refinance," that the Property was Plaintiffs' primary residence, and that there were no mortgage loans on the Property.

23. On July 31, 2025, Kind Lending issued a "Lock Confirmation" for Plaintiffs' loan. The Lock Confirmation bears Kind Lending's name and logo and Kind Lending's loan number 7000145046. It identifies the borrower as Tran Le and the property as 6951 Carthage Street; states "Program Details: Freddie 30 Year Fixed," "Purpose: Refinance," "Occupancy: Primary Residence," "Loan Amount: $748,600.00," "LTV/CLTV/HCLTV: 95.00%/95.00%/95.00%," "Note Rate: 6.625%," "MI Type: Borrower Paid Monthly Premiums," "Monthly MI Amt: $193.39," "Lock Date: 07/31/2025," and "Lock Expiration: 09/09/2025." Under "Pricing Itemization," the Lock Confirmation applies a price adjustment described as "Limited Cash-Out - FICO >= 760 <= 779, LTV > 90 <= 95."

24. In the mortgage industry, and in the selling guides of Fannie Mae and Freddie Mac that Defendants invoked, a "limited cash-out" or "no cash-out" refinance is a rate-and-term refinance: a transaction that pays off an existing first

THE LAW OFFICES OF: ANDRE L. VERDUN

mortgage and closing costs and returns to the borrower no more than a nominal amount of cash, capped at the lesser of two percent of the new loan or Two Thousand Dollars ($2,000.00) under the Fannie Mae Selling Guide in effect in July 2025. Under that guide, a property with no existing first mortgage is not eligible for a limited cash-out refinance. A transaction that takes equity out of a property owned free and clear, or that refinances a property purchased for cash within the preceding six months, is a “cash-out” refinance, and a cash-out refinance of a one-unit principal residence is limited to 80 percent loan-to-value. Limited cash-out refinances, by contrast, are permitted up to 95 percent loan-to-value and above. Mortgage insurers apply corresponding limits and do not insure cash-out refinances at 95 percent loan-to-value.

25. Plaintiffs’ loan was, and was always represented to Plaintiffs as, a cash-out refinance of a house with no mortgage on it. From July 31, 2025, Arbor and Kind Lending had classified, priced, locked, and run Plaintiffs’ cash-out loan as a limited cash-out loan. The 95 percent loan-to-value ratio, the 6.625 percent rate, and the zero-point pricing that Hunjadi quoted on July 29, 2025 were available only under that classification. A licensed originator with thirty years of experience knows the difference between a cash-out and a limited cash-out refinance, knows that a free-and-clear property cannot be refinanced as a limited cash-out transaction, and knows that a 95 percent cash-out refinance is not an agency product.

26. Plaintiffs did not know, and had no means of knowing, that the loan had been classified as a limited cash-out refinance. The classification appeared only in lender-completed forms and in Kind Lending’s pricing. Neither Kind Lending nor the Arbor Defendants disclosed that fact to Plaintiffs at any time before October 1, 2025.

THE LAW OFFICES OF: ANDRE L. VERDUN

**C. Underwriting: Plaintiffs Perform, and Arbor Reports Approval**

27. Throughout August 2025, Plaintiffs promptly provided every document the Arbor Defendants requested and satisfied every underwriting condition communicated to Plaintiffs. On August 8, 2025, Plaintiffs paid an appraisal fee of Six Hundred Fifteen Dollars and Zero Cents ($615.00). The appraisal valued the Property at Eight Hundred Fifty Thousand Dollars and Zero Cents ($850,000.00).

28. On August 18, 2025, at 4:21 p.m., Hunjadi emailed Plaintiffs a list of eleven conditions for final approval, including “[p]rovide the source of funds used to purchase the property,” and stated that the underwriter had approved the loan subject to those conditions. The request for the source of the purchase funds is the documentation that agency guidelines require for a cash-out refinance of a recently purchased, cash-acquired property, and the Arbor Defendants knew from that date at the latest that the transaction was a cash-out refinance of a property purchased for cash.

29. On August 28, 2025, at 11:47 a.m., Hunjadi confirmed in writing that all conditions had been received: “Everything is there from what I see it is in line for UW review/sign off so they can sign off and get CD ASAP.”

30. Between September 2 and September 15, 2025, Plaintiffs repeatedly asked Hunjadi for the clear-to-close status of the file. On September 2, 2025, Hunjadi wrote that the underwriter would be “doing the final review” and that Hunjadi had “received the exception to order the CD before CTC.” On September 5, 2025, Hunjadi reported that the Closing Disclosure had been sent electronically. The September 5, 2025 Closing Disclosure listed a monthly mortgage insurance premium.

31. On September 15, 2025, at 11:30 a.m., Hunjadi wrote: “I spoke with the underwriter and we did a conference call with the MI underwriter as well,” and

THE LAW OFFICES OF: ANDRE L. VERDUN

listed six remaining items, one of which required a federal tax return copy because "the MI company will not" accept the state copy. Plaintiffs supplied the six items. Hunjadi, the underwriter, and the mortgage insurance underwriter reviewed Plaintiffs' file together on that date without disclosing, correcting, or, on information and belief, detecting that a cash-out refinance had been submitted for insurance as a rate-and-term refinance.

32. On September 17, 2025, at 7:13 p.m., Hunjadi represented that the mortgage insurance certificate would be received the next day and that loan documents would then be released. No mortgage insurance certificate was issued on September 18, 2025, or at any later time. The Arbor Defendants did not tell Plaintiffs that the certificate had not issued.

33. Arbor's Lock-In Confirmation expired on August 30, 2025, and Kind Lending's rate lock expired on September 9, 2025, because of delays in underwriting that were not attributable to Plaintiffs. Neither Kind Lending nor the Arbor Defendants told Plaintiffs that either lock had expired, that the loan was being documented at a rate that was no longer locked, or that any extension had been obtained. On information and belief, between September 9 and September 22, 2025, Arbor relocked or replaced the loan, without notice to Plaintiffs, with a different investor or on different terms.

**D. "Clear to Close," the Executed Loan Documents, and the Confirmed Funding Date**

34. On September 22, 2025, at 2:27 p.m., Hunjadi wrote to Plaintiffs and the escrow officer: "Loan documents have been sent to escrow. The same set needs to be signed, they cannot be signed in counterpart unfortunately they will need to sign the same set." In mortgage lending practice, a lender releases final loan documents to escrow only after the file is cleared to close, meaning that underwriting is complete and all conditions to funding other than the closing

THE LAW OFFICES OF: ANDRE L. VERDUN

conditions have been satisfied. At 2:21 p.m. that day, Plaintiffs, through their sister, had written to Hunjadi and the escrow officer, “I can see that we got the CTC,” and Hunjadi did not correct that statement. The same day, escrow issued amended instructions reciting that “[t]he Borrower(s) have qualified for and obtained a new first Conventional Uninsured loan through The Turnkey Foundation, Inc DBA Arbor Financial Group in the amount of $748,600.00, bearing interest at the initial rate of 6.625%.”

35. On September 22, 2025, Arbor issued the final Closing Disclosure. It identified the “Lender” as “The Turnkey Foundation Inc Dba Arbor Financial Group,” the loan amount as Seven Hundred Forty-Eight Thousand Six Hundred Dollars and Zero Cents ($748,600.00), the interest rate as 6.625 percent, the appraised property value as Eight Hundred Fifty Thousand Dollars and Zero Cents ($850,000.00), a monthly mortgage insurance premium of Two Hundred Thirty Dollars and Eighty-Two Cents ($230.82), total payoffs of zero, and cash to the borrowers of Seven Hundred Thirty-Seven Thousand One Hundred Sixty-Seven Dollars and Sixty-Six Cents ($737,167.66). The Closing Disclosure did not identify a mortgage insurance provider. No mortgage insurance had been arranged for the loan as structured.

36. Also on September 22, 2025, Arbor completed the final “Lender Loan Information” section of the Uniform Residential Loan Application. In that lender-completed section Arbor marked the “Refinance Type” as “No Cash Out” and calculated “Cash From/To the Borrower” as Seven Hundred Thirty-Seven Thousand Seven Hundred Eighty-Two Dollars and Sixty-Six Cents ($737,782.66) to the borrowers. On the same date, Arbor’s Addendum to Closing Instructions for the same loan stated, in capital letters, “CASH-OUT TRANSACTION-NO POWER OF ATTORNEY ALLOWED.” Arbor thus described the same loan, on the same day, as a “No Cash Out” refinance to the investor and the mortgage

insurer and as a "CASH-OUT TRANSACTION" to escrow.

37. On September 23, 2025, Tory Le executed the loan documents in New York City. On September 25, 2025, Tran Le executed the loan documents in San Diego. The executed package included a Promissory Note in the principal amount of Seven Hundred Forty-Eight Thousand Six Hundred Dollars and Zero Cents ($748,600.00) at 6.625 percent payable to Arbor, a Deed of Trust in favor of Arbor and its nominee, the Closing Disclosure, the California Private Mortgage Insurance Disclosure required by California Civil Code section 2954.6, General and Specific Closing Instructions issued by Arbor, an Addendum to Closing Instructions, a Per Diem Interest Disclosure signed by Hunjadi as "Lender Representative" under penalty of perjury, a Compliance Agreement in which Plaintiffs agreed to cooperate in correcting documents "to enable Lender to sell, convey, seek guaranty or market said loan to any entity, including but not limited to, an investor, Fannie Mae, Freddie Mac," and a California Financing Law Statement of Loan identifying Arbor as the licensed finance lender.

38. The executed package also included a pre-printed Allonge to the Promissory Note reading "PAY TO THE ORDER OF NEWREZ WHOLESALE Without Recourse" and a Notice of Servicing Transfer stating that servicing would transfer to NewRez LLC effective with the first payment. Arbor's Servicing Disclosure Statement of July 31, 2025 had already told Plaintiffs: "We do not service mortgage loans of the type for which you applied. We intend to assign, sell, or transfer the servicing of your mortgage loan before the first payment is due." Kind Lending's name does not appear on any document Plaintiffs signed. On information and belief, the transaction was structured from inception so that Arbor would originate the loan, Kind Lending would underwrite and make the credit decision, and Kind Lending or NewRez would fund or purchase the closed loan, with Arbor compensated through the pricing of the loan.





THE LAW OFFICES OF ANDRE L. VERDUN

THE LAW OFFICES OF: ANDRE L. VERDUN

39. The Addendum to Closing Instructions, under the heading "Additional conditions to be satisfied prior to disbursement of loan proceeds," listed the funding conditions, and each page stated: "THIS IS THE ENTIRE LIST OF FUNDING CONDITIONS-A SEPARATE EMAIL WILL NOT BE SENT." Issuance of a mortgage insurance certificate was not among the listed conditions. Approval of the loan by an investor was not among the listed conditions. The Promissory Note contained no condition relating to mortgage insurance or investor approval.

40. On September 25, 2025, at 4:55 p.m., Plaintiffs notified Hunjadi and the escrow officer that both borrowers had signed and asked for confirmation of the closing and funding date. At 4:56 p.m., the escrow officer, Jennifer Morris of Oakwood Escrow, replied: "Yes, we can fund and record on the 30th."

41. On September 26, 2025, at 12:41 p.m., the escrow officer confirmed that the "[e]xecuted loan documents have been sent to the lender for review." At 12:43 p.m., Hunjadi acknowledged receipt of the executed loan documents. Every condition listed in the Addendum to Closing Instructions had been satisfied by that date.

42. The three-business-day rescission period under 15 U.S.C. § 1635 expired without Plaintiffs exercising any right to rescind.

43. On September 29, 2025, at 7:01 a.m., Plaintiffs, through their sister, asked Hunjadi and the escrow officer whether the funder had all funding conditions. At 7:03 a.m., Hunjadi replied: "They have it in line for funding review and I have followed up as well." At 3:35 p.m., Plaintiffs asked for the wire amount.

**E. September 30, 2025: No Funding**

44. On September 30, 2025, the confirmed funding date, at 12:08 p.m., Plaintiffs asked Hunjadi for an update and were told that the underwriter needed to complete a task. At 4:38 p.m., Plaintiffs wrote that funding obviously would not

occur that day and asked whether there was another issue. Hunjadi replied that "they are still working on it." The loan did not fund.

45. On October 1, 2025, at 2:57 p.m., Tran Le emailed Hunjadi demanding an explanation and a call with someone who could give definitive answers. At 3:21 p.m., Hunjadi replied, verbatim as to the operative sentences:

> "You are correct there have not been any meaningful updates or results as I am waiting for an update as well for the definitive response which I just hung up with them. They were having conflicting information for how the underwriter entered and underwrote the file as compared with the mortgage insurance for delayed financing. The Mortgage Insurance they entered was as rate and term and it is cash out the MI will not insure the cash out to 95% of the value, the underwriter escalated it to their credit risk to see what they can do. That is what has been taking the time for them to try to resolve the error to get a solution. You are absolutely right and I understand the frustration and this situation should not have occurred."

46. Hunjadi's October 1, 2025 email referred Tran Le to "David Arvidson my broker" for a formal complaint. The email was the first disclosure to Plaintiffs that the loan had been entered and underwritten as a rate-and-term refinance, that mortgage insurance had not been obtained, and that the mortgage insurer would not insure a cash-out refinance at 95 percent loan-to-value. Every representation made to Plaintiffs between July 29 and September 29, 2025 that the loan was available, locked, approved, cleared, documented, and in line for funding had been made while the loan carried that defect.

**<u>F. The Counteroffers and the Silence</u>**

47. On October 1, 2025, at 9:02 p.m., Tran Le escalated the matter to





The Law Offices of: Andre L. Verdun

THE LAW OFFICES OF: ANDRE L. VERDUN

Arvidson. On October 2, 2025, Arvidson called Tran Le and then wrote, at 5:22 p.m.: “Just got off the phone with Account executive at Kind Lending. She confirmed that the new loan amount would be at 80% loan to value. The interest rate is 6.625 on the lock but we are requesting an updated lock stack to see if a float down is available.... Obviously since LTV is now 80% the MI would go away. In addition, the AE will expedite the final approval with a rush and if you approve the new loan terms we can draw loan documents immediately while we wait for their underwriting.”

48. On October 3, 2025, at 11:01 a.m., Hunjadi sent a revised Closing Disclosure, dated October 3, 2025 and still identifying Arbor as “Lender,” reflecting a loan amount of Six Hundred Thirty Thousand Four Hundred Dollars and Zero Cents ($630,400.00), which is 80 percent of the Seven Hundred Eighty-Eight Thousand Dollar ($788,000.00) value Arbor had used on July 31, 2025, and a reduction of One Hundred Eighteen Thousand Two Hundred Dollars and Zero Cents ($118,200.00) from the executed loan amount.

49. On October 5, 2025, at 6:04 p.m., Tran Le wrote to Arvidson and Hunjadi that Plaintiffs had executed final loan documents on September 25, 2025, had met every borrower requirement, and had caused no error, and demanded that Arbor either fund the loan under the executed terms or make Plaintiffs financially whole for the difference in proceeds, with a response by the close of business on October 6, 2025.

50. On October 6, 2025, at 1:55 p.m., Arvidson replied, verbatim: “Per our conversation last week, we aren’t refusing to fund your loan rather the bank (Kind Lending - who makes the lending decision and underwrites the file) is stating that the original loan to value is a violation of Fannie Mae’s guidelines. Hence, they would have an unsaleable non-compliant loan. In addition, we have been working with the underwriter at Kind Lending to maximize the cash-out to

THE LAW OFFICES OF ANDRE L. VERDUN

you. The maximum loan amount that they can go to is $680,000 and we are providing a lender credit of $3,165 to cover lender fees and all notary and re-signing fees." Arvidson attached a second revised Closing Disclosure, dated October 6, 2025, reflecting a loan amount of Six Hundred Eighty Thousand Dollars and Zero Cents ($680,000.00), which is 80 percent of the Eight Hundred Fifty Thousand Dollar ($850,000.00) appraised value.

51. On October 7, 2025, at 10:32 a.m., Tran Le wrote to Arvidson that Plaintiffs did not accept the proposed Six Hundred Eighty Thousand Dollar ($680,000.00) loan, that a loan approved and documented in violation of investor guidelines was the lender's non-compliance and not the borrowers', and that Plaintiffs required, by the close of business that day, either funding as executed, compensation for the difference in proceeds, or a written offer of the closest equivalent loan terms. Arvidson did not respond. No Defendant has responded to that demand since.

52. At no time did Arbor, Kind Lending, or any other Defendant provide Plaintiffs with a written notice of action taken, a written notice of counteroffer containing the disclosures required by Regulation B, a written notice of adverse action, a statement of specific reasons for the action taken, or the notice of the Equal Credit Opportunity Act required by 12 C.F.R. § 1002.9(b)(1).

**G. Arbor's Dual Role: Lender on the Documents, Broker in Fact**

53. At all relevant times Arbor held a California real estate broker license and a California Financing Law license, and arranged residential mortgage loans to be funded or purchased by third-party investors. In Plaintiffs' transaction, Arbor, through Hunjadi, "reached out to several investors," solicited Plaintiffs' application, gathered Plaintiffs' financial information, submitted the loan to Kind Lending for pricing, underwriting, and a credit decision, relayed Kind Lending's conditions and decisions to Plaintiffs, prepared and delivered the disclosures and

closing documents, coordinated with escrow, and, after the failure to fund, negotiated with Kind Lending's account executive on Plaintiffs' behalf for "the maximum loan amount that they can go to." Arbor performed those services for compensation or in the expectation of compensation, whether paid by Plaintiffs, by the investor, or through the pricing of the loan.

54. Arbor delivered to Plaintiffs the forms of a Department of Real Estate licensee acting as a loan broker, including the Department of Real Estate Fair Lending Notice (Form RE 867) and a "California Acknowledgment of Receipt of Loan Estimate" referencing California Business and Professions Code section 10240, and Hunjadi and Arvidson each identified themselves to Plaintiffs by their Department of Real Estate license numbers. Hunjadi described Arvidson to Plaintiffs as "my broker." At the same time, Arbor named itself "Lender" on the Loan Estimate, Closing Disclosure, Promissory Note, and Deed of Trust, and the California Financing Law Statement of Loan that Arbor prepared for Plaintiffs' signature answered "No" to the question "Has any person performed any act as a broker in connection with the making of your loan?" That answer was inaccurate. Arbor did not disclose to Plaintiffs that Arbor was arranging a loan that Kind Lending would underwrite and decide, that Arbor's ability to fund depended on the investor's acceptance of the loan, or what Arbor would be paid by the investor.

55. By soliciting Plaintiffs' business with the representation that Arbor had canvassed "several investors" for the best available terms, and by undertaking to arrange a loan to be underwritten, decided, and funded or purchased by a third party, Arbor undertook to act as Plaintiffs' mortgage broker and agent and owed Plaintiffs the fiduciary duties of a real estate broker negotiating a loan secured by real property under California Business and Professions Code section 10131(d), regardless of whether Arbor was also named as the lender on the closing





THE LAW OFFICES OF: ANDRE L. VERDUN

THE LAW OFFICES OF: ANDRE L. VERDUN

documents. Arbor was further a “mortgage broker” providing “mortgage brokerage services” to Plaintiffs within the meaning of California Civil Code section 2923.1(b)(2) and (3), and Plaintiffs’ fiduciary under section 2923.1(a). As a finance lender or broker subject to the California Financing Law, Arbor was prohibited by California Financial Code section 22161 from making any materially false or misleading statement or representation to Plaintiffs about the terms or conditions of Plaintiffs’ loan and from knowingly misrepresenting or concealing any material aspect of the loan.

56. Hunjadi, as the licensed originator who performed the brokerage services, and Arvidson, as the licensed broker who supervised and then personally conducted the transaction, each owed Plaintiffs the same fiduciary duties and were each subject to California Business and Professions Code sections 10176 and 10177.

## H. What Plaintiffs Did in Reliance, and What the Failure to Fund Cost Plaintiffs

57. In reliance on the representations that the 95 percent loan was available and locked, and then that the loan was approved, cleared to close, and ready to fund, Plaintiffs stopped shopping for financing elsewhere (Plaintiffs had made an inquiry with another lender on July 28, 2025 and made none after July 29, 2025), provided all requested documentation over two months, paid the appraisal fee, paid Two Thousand Seven Hundred Eighty-Three Dollars and Zero Cents ($2,783.00) in closing costs before closing as reflected on the Closing Disclosure, paid in advance for a California FAIR Plan homeowner’s insurance policy that the lender required, arranged Tory Le’s execution of the documents in New York, executed a Promissory Note and Deed of Trust encumbering the Property, allowed the rescission period to expire, told contractors to proceed with renovation scheduling, and arranged the family’s finances around receipt of the

THE LAW OFFICES OF: ANDRE L. VERDUN

loan proceeds on September 30, 2025.

58. When the loan did not fund, Plaintiffs could not repay the line of credit or the family members who had contributed to the purchase. The investment-secured line of credit continued to accrue interest of approximately Three Thousand Two Hundred Thirty-One Dollars and Forty-Two Cents ($3,231.42) per month. Renovation work stopped. Family members covered living expenses on credit.

59. Plaintiffs ultimately obtained substitute financing from another lender, which closed in early 2026, in the amount of Six Hundred Thirty Thousand Four Hundred Dollars and Zero Cents ($630,400.00) at 6.625 percent, at a cost of approximately Twelve Thousand Eight Hundred Sixty-Six Dollars and Zero Cents ($12,866.00) in discount points and approximately Twenty Thousand Seven Hundred Thirty-One Dollars and Zero Cents ($20,731.00) in total closing costs. Plaintiffs would have incurred none of those points and costs had Defendants funded the loan Defendants documented at zero points. Plaintiffs continue to carry on the line of credit, at the rate described above, the portion of the purchase funds that Defendants' loan would have repaid.

60. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages including the appraisal fee and the other closing costs paid before closing; the insurance premium; the cost of locating, negotiating, and closing substitute financing, including the discount points, fees, and any difference in interest rate over the life of the substitute loan; the interest accrued on the line of credit from September 30, 2025 through the date of substitute funding, and thereafter on the portion that the substitute loan did not replace; the increased cost of the delayed renovation; Tory Le's travel and execution costs; and loss of use of the loan proceeds. Each of these losses was foreseeable to Defendants, who knew from July 29, 2025 that the purpose of the loan was to

recoup the cash used to purchase the Property and who confirmed the September 30, 2025 funding date on which the family's finances depended.

61. Tran Le and Tory Le have also suffered emotional distress as a result of the Arbor Defendants' conduct, including anxiety, sleeplessness, and distress over the family's finances.

**I. The CLRA Notice**

62. On or about October 30, 2025, Plaintiffs sent Arbor a notice pursuant to California Civil Code section 1782(a) by certified mail, return receipt requested, identifying the practices declared unlawful by section 1770 and demanding correction, repair, replacement, or other rectification. More than thirty (30) days passed before Plaintiffs first asserted a claim for damages under the Consumers Legal Remedies Act, and Arbor has not offered an appropriate correction, repair, replacement, or other remedy, or agreed to do so within a reasonable time.

**FIRST CAUSE OF ACTION**

**Negligent Misrepresentation**

**(Against Arbor, Arvidson, and Hunjadi)**

63. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

64. The Arbor Defendants made the following positive assertions of past or existing fact to Plaintiffs, each in writing and each without reasonable grounds for believing it to be true: (a) on July 29, 2025, that Arbor had "reached out to several investors" and "could do up to 95% on a 30 year fixed at 6.625% with zero points"; (b) on July 31, 2025, in the Loan Estimate and the Lock-In Confirmation signed by Hunjadi, that a Seven Hundred Forty-Eight Thousand Six Hundred Dollar ($748,600.00) loan at 95 percent loan-to-value, 6.625 percent, and zero points was available to Plaintiffs and had been "secured" and locked;





THE LAW OFFICES OF: ANDRE L. VERDUN

(c) on August 18 and 28, 2025, that the underwriter had approved the loan and that all conditions had been received; (d) on September 15, 2025, that Hunjadi had spoken with the underwriter and conferred with the mortgage insurance underwriter, and that only the six listed items remained; (e) on September 17, 2025, that the mortgage insurance certificate would issue the next day; (f) on September 22, 2025, by releasing final loan documents to escrow and by not correcting the written statement "we got the CTC," that the loan was cleared to close; (g) on September 22, 2025, in the Closing Disclosure, that mortgage insurance at Two Hundred Thirty Dollars and Eighty-Two Cents ($230.82) per month had been arranged for the loan; (h) on September 22, 2025, in the Addendum to Closing Instructions, that the listed conditions were "THE ENTIRE LIST OF FUNDING CONDITIONS"; and (i) on September 29, 2025, that the loan was "in line for funding review."

65. Each of these assertions was false when made. A 95 percent loan-to-value cash-out refinance of a free-and-clear property was not available from Arbor's investors, from Kind Lending, or under the agency guidelines that governed the loan; the loan had been classified, priced, and entered as a limited cash-out or no cash-out refinance; mortgage insurance for a cash-out refinance at 95 percent loan-to-value had not been obtained and was not obtainable; the mortgage insurance certificate promised for September 18, 2025 had not issued; the rate locks had expired on August 30 and September 9, 2025; and the loan was not cleared to close or in line for funding in any sense that could result in funding.

66. The Arbor Defendants made these assertions in the course of the Arbor Defendants' business and profession, with the intent that Plaintiffs rely on the assertions by proceeding with Arbor, ceasing to shop for other financing, supplying documentation and fees, executing the loan documents, and refraining



THE LAW OFFICES OF: ANDRE L. VERDUN

from seeking financing elsewhere. The Arbor Defendants had no reasonable grounds for believing the assertions to be true: the Arbor Defendants themselves had completed the lender sections of the application marking the loan "Limited Cash Out" and "No Cash Out," had themselves written "CASH-OUT TRANSACTION" in the funding conditions, had themselves requested the source of the purchase funds, had themselves conferred with the mortgage insurance underwriter, and had access to the Lock Confirmation, the automated underwriting findings, and the mortgage insurance submission. A mortgage professional with that information would have known that the loan was classified as a limited cash-out refinance, that the classification was wrong, and that no certificate had issued.

67. Plaintiffs justifiably relied on the assertions. Neither Plaintiff is a mortgage lender, broker, originator, or underwriter. Plaintiffs had no access to the lender-completed sections of the application, the underwriting file, the automated underwriting findings, or the mortgage insurance submission, and were entitled to rely on the written statements of a licensed originator with thirty years of experience and of the licensed lender that had locked the rate, approved the loan, and drawn the documents.

68. As a direct and proximate result, Plaintiffs suffered the damages alleged above in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

## Intentional Misrepresentation, Concealment, and Promissory Fraud

## (Pleaded in the Alternative)

## (Against Arbor, Arvidson, and Hunjadi)

69. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

70. In the alternative to the First Cause of Action, Plaintiffs allege on



THE LAW OFFICES OF: ANDRE L. VERDUN

information and belief that the Arbor Defendants knew, when Hunjadi quoted a 95 percent loan-to-value cash-out refinance at 6.625 percent with zero points on July 29, 2025, that those terms were available only for a limited cash-out refinance and not for the cash-out refinance of a free-and-clear property that Plaintiffs had requested, and that the Arbor Defendants classified the loan as a limited cash-out refinance in order to obtain pricing, a lock, and an automated underwriting approval that the transaction could not otherwise obtain.

71. Plaintiffs further allege on information and belief that, by no later than September 15, 2025, when Hunjadi conferred with the underwriter and the mortgage insurance underwriter, and in any event by September 17, 2025, when Hunjadi represented that the mortgage insurance certificate would issue the next day, the Arbor Defendants knew that the certificate had not issued and that the mortgage insurer had not approved insurance for the loan as structured, and that the Arbor Defendants nonetheless released final loan documents on September 22, 2025 and represented the loan as cleared to close in order to secure Plaintiffs' signatures before the problem surfaced.

72. The Arbor Defendants concealed from Plaintiffs the facts that the loan had been classified as a limited cash-out or no cash-out refinance, that the rate locks had expired, that no mortgage insurance certificate had issued, and that Arbor's ability to fund depended on a third-party investor's acceptance of the loan. The Arbor Defendants had a duty to disclose those facts as Plaintiffs' fiduciaries, as parties with exclusive knowledge of material facts not reasonably accessible to Plaintiffs, and as parties who had made partial representations about the loan's approval and status that were misleading without those facts.

73. The Arbor Defendants further promised that the loan would fund on September 30, 2025 upon satisfaction of the listed conditions, and on information and belief made that promise without the intention or the ability to perform it as





The Law Offices of: Andre L. Verdun

The Law Offices of: Andre L. Verdun

represented.

74. The Arbor Defendants made these representations, concealments, and promises with knowledge of their falsity or with reckless disregard for the truth, and with the intent to induce Plaintiffs' reliance. Plaintiffs justifiably relied as alleged above and were damaged as alleged above.

75. In doing the acts alleged herein, the Arbor Defendants acted with fraud, oppression, and malice within the meaning of California Civil Code section 3294, and Arvidson, an officer, director, or managing agent of Arbor, personally participated in, authorized, or ratified the conduct. Plaintiffs are entitled to punitive damages against the Arbor Defendants in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**

**Constructive Fraud (Cal. Civ. Code § 1573)**

**(Against Arbor, Arvidson, and Hunjadi)**

76. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

77. California Civil Code section 1573 provides that constructive fraud consists of "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him."

78. As Plaintiffs' mortgage broker and fiduciary, the Arbor Defendants owed Plaintiffs a duty of full disclosure of all material facts concerning the loan. The Arbor Defendants breached that duty by relaying the underwriter's approvals, the clear-to-close status, and the mortgage insurance figures to Plaintiffs as settled facts without disclosing that the Arbor Defendants were passing on another party's determinations, that the loan had been classified as a

limited cash-out or no cash-out refinance, that the Arbor Defendants had not confirmed that mortgage insurance had been approved or a certificate issued, that the rate locks had expired, and that funding depended on an investor's acceptance of the loan.

79. By that breach the Arbor Defendants gained an advantage: Plaintiffs remained with Arbor rather than seeking another lender, supplied the documentation and fees that allowed the file to proceed toward a closing from which Arbor expected compensation, and executed loan documents in Arbor's favor.

80. Plaintiffs were misled to Plaintiffs' prejudice and suffered the damages alleged above. The Arbor Defendants' conduct was willful, malicious, oppressive, fraudulent, and in conscious disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages pursuant to California Civil Code section 3294.

**FOURTH CAUSE OF ACTION**

**Breach of Fiduciary Duty (Common Law; Cal. Civ. Code § 2923.1; Cal. Fin. Code § 22161)**

**(Against Arbor, Arvidson, and Hunjadi)**

81. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

82. A real estate broker who undertakes to negotiate or arrange a loan secured by real property for a borrower is the borrower's agent and fiduciary, and owes the borrower the duties of utmost care, honesty, loyalty, and full disclosure of all facts that might affect the borrower's decision. A licensee that also makes loans in its own name remains the borrower's fiduciary when it undertakes to shop the borrower's loan among other lenders or investors, regardless of how the closing documents describe the licensee.

83. California Civil Code section 2923.1(a) further provides that "[a]





THE LAW OFFICES OF: ANDRE L. VERDUN

mortgage broker providing mortgage brokerage services to a borrower is the fiduciary of the borrower, and any violation of the broker's fiduciary duties shall be a violation of the mortgage broker's license law," and that "[t]his fiduciary duty includes a requirement that the mortgage broker place the economic interest of the borrower ahead of the mortgage broker's own economic interest." The duty applies "regardless of whether the mortgage broker is acting as an agent for any other party in connection with the residential mortgage loan transaction," and a "mortgage broker" includes "a licensed person who makes a residential mortgage loan" when that person provides mortgage brokerage services. (Cal. Civ. Code § 2923.1(a), (b)(2).)

84. California Financial Code section 22161 prohibits any person subject to the California Financing Law from making "a materially false or misleading statement or representation to a borrower about the terms or conditions of that borrower's loan, when making or brokering the loan," from knowingly misrepresenting, circumventing, or concealing any material aspect or information regarding a transaction, and from committing an act that constitutes fraud or dishonest dealings.

85. The Arbor Defendants undertook to act as Plaintiffs' broker and agent and provided mortgage brokerage services to Plaintiffs as alleged above, and were Plaintiffs' fiduciaries.

86. The Arbor Defendants breached the fiduciary duties owed to Plaintiffs, and violated California Financial Code section 22161, by, among other things: (a) representing that a 95 percent loan-to-value cash-out refinance at 6.625 percent with zero points was available when it was not; (b) classifying, or permitting Kind Lending to price and underwrite, a cash-out refinance as a limited cash-out or no cash-out refinance, and failing to detect or correct that classification at any point between July 31 and September 30, 2025; (c)

The Law Offices of: Andre L. Verdun

representing the loan as approved and cleared to close, and releasing final loan documents for signature, without confirming that mortgage insurance had been approved and a certificate issued; (d) failing to disclose that the certificate promised for September 18, 2025 had not issued, that the rate locks had expired, that funding depended on an investor's acceptance, and that the loan as structured could not be insured or sold; (e) preparing for Plaintiffs' signature a California Financing Law Statement of Loan that denied that any person had acted as a broker, while concealing Arbor's role and compensation; (f) after the failure to fund, placing the Arbor Defendants' economic interest in delivering a saleable loan ahead of Plaintiffs' economic interest in the loan Plaintiffs had bargained for and signed, by offering only loans at 80 percent of value; and (g) ceasing to communicate with Plaintiffs on October 7, 2025.

87. Plaintiffs did not discover, and could not reasonably have discovered, the facts constituting these breaches before October 1, 2025.

88. As a direct and proximate result of the breaches, Plaintiffs suffered the damages alleged above, including emotional distress. The Arbor Defendants' conduct was willful, malicious, oppressive, fraudulent, and in conscious disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages pursuant to California Civil Code section 3294.

## FIFTH CAUSE OF ACTION

## Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing

## (Against Arbor)

89. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

90. On or about September 22 through 26, 2025, Plaintiffs and Arbor entered into a written agreement for a refinance loan secured by the Property.





THE LAW OFFICES OF ANDRE L. VERDUN

THE LAW OFFICES OF: ANDRE L. VERDUN

The agreement consists of the Lock-In Confirmation signed by Hunjadi for Arbor on July 31, 2025; the Closing Disclosure issued by Arbor on September 22, 2025; the General and Specific Closing Instructions and the Addendum to Closing Instructions issued by Arbor on September 22, 2025; the Per Diem Interest Disclosure signed by Hunjadi for Arbor; and the Promissory Note and Deed of Trust prepared by Arbor, executed by Plaintiffs on September 23 and 25, 2025, and delivered to Arbor on September 26, 2025. Each of those writings identifies Arbor as the lender or creditor, and together they state every material term: the parties, the loan amount of Seven Hundred Forty-Eight Thousand Six Hundred Dollars and Zero Cents ($748,600.00), the interest rate of 6.625 percent, the 360-month term, the monthly payment, the maturity date, the security, the closing costs, the cash to be disbursed to Plaintiffs, and the conditions to disbursement, which Arbor represented to be "THE ENTIRE LIST OF FUNDING CONDITIONS." Under that agreement, Arbor agreed to fund the loan upon satisfaction of the listed conditions, and Plaintiffs agreed to repay the loan and to encumber the Property as security.

91. The agreement was a contract to lend money for personal, family, and household purposes, secured by a one-unit residential property, and is not within California Civil Code section 1624(a)(7). To the extent any writing requirement applies, it is satisfied by the writings described above, which were prepared and issued by Arbor and signed by Arbor's authorized representative, and by Plaintiffs' full performance in reliance on the agreement, including Plaintiffs' execution and delivery of the Promissory Note and Deed of Trust, such that Arbor is estopped to deny the agreement.

92. Plaintiffs performed every obligation required of Plaintiffs under the agreement, or were excused from performance. Plaintiffs executed every required document, satisfied every disclosed condition, allowed the rescission

period to expire, and stood ready, willing, and able to close.

93. Arbor breached the agreement by failing and refusing to fund the loan on September 30, 2025 or thereafter. Arbor's stated reason, that the loan had been classified as a rate-and-term refinance for mortgage insurance and investor purposes and could not be insured or sold at 95 percent loan-to-value, was not a disclosed condition of funding and was entirely within Defendants' control and knowledge. Arbor did not fund the loan because Arbor could not resell a loan that Arbor had misclassified; that is not a failure of any condition of the parties' agreement.

94. Arbor further breached the covenant of good faith and fair dealing implied in the agreement by directing Plaintiffs to execute final loan documents before confirming that the loan could be insured and funded, by withholding the reason for the failure to fund until October 1, 2025, and by conditioning any funding on Plaintiffs' acceptance of materially worse terms.

95. Under California law, any uncertainty in the agreement is construed against Arbor, the party that drafted it. (Cal. Civ. Code § 1654.)

96. As a direct and proximate result of Arbor's breach, Plaintiffs suffered damages in an amount to be proven at trial, measured by the cost of obtaining substitute financing, including the discount points, fees, and any difference in interest rate between the agreed loan and the substitute loan over the life of the loan; the costs of locating and negotiating the substitute loan; the carrying cost on the line of credit of the funds that Arbor's loan would have repaid; the out-of-pocket expenses of the failed transaction; and the consequential losses alleged above, which Arbor had reason to foresee when the agreement was made because Arbor knew the purpose of the loan and the family's dependence on the funding date. Plaintiffs are entitled to prejudgment interest pursuant to California Civil Code section 3287.



THE LAW OFFICES OF: ANDRE L. VERDUN

97. To the extent the Promissory Note or any other document comprising the agreement contains an attorney's fee provision, Plaintiffs are entitled to reasonable attorney's fees pursuant to California Civil Code section 1717.

**SIXTH CAUSE OF ACTION**

**Promissory Estoppel (Pleaded in the Alternative)**

**(Against Arbor)**

98. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

99. In the alternative to the Fifth Cause of Action, and to the extent the Court determines that no enforceable contract to lend was formed, Plaintiffs allege that Arbor made clear and unambiguous promises to Plaintiffs: that a Seven Hundred Forty-Eight Thousand Six Hundred Dollar ($748,600.00) loan at 6.625 percent with zero points was locked and would close on those terms subject to loan approval; that the loan was approved and cleared to close; that final loan documents were ready for execution and would be funded upon execution, satisfaction of the listed conditions, and expiration of the rescission period; that the listed funding conditions were complete; and that funding would occur on September 30, 2025.

100. Arbor made these promises intending, and reasonably expecting, that Plaintiffs would rely on the promises. Plaintiffs reasonably and foreseeably relied on the promises as alleged above, including by ceasing to shop for other financing, executing a Promissory Note and Deed of Trust, incurring expenses, and arranging the family's finances around the September 30, 2025 funding date, all to Plaintiffs' detriment.

101. Injustice can be avoided only by enforcement of Arbor's promises. Plaintiffs are entitled to damages sufficient to place Plaintiffs in the position Plaintiffs would have occupied had Arbor performed, or, in the alternative, to





THE LAW OFFICES OF: ANDRE L. VERDUN

reliance damages compensating Plaintiffs for the detriment suffered in reliance on the promises, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

## Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(d); 12 C.F.R. § 1002.9

## (Against Arbor and Kind Lending)

102. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

103. The Equal Credit Opportunity Act ("ECOA") requires a creditor to notify an applicant of its action on a completed application within thirty (30) days. (15 U.S.C. § 1691(d)(1); 12 C.F.R. § 1002.9(a)(1)(i).) Where a creditor makes a counteroffer that the applicant does not expressly accept or use, the creditor must provide notice of adverse action within ninety (90) days after notifying the applicant of the counteroffer. (12 C.F.R. § 1002.9(a)(1)(iv).) A notice of adverse action must be in writing and must contain a statement of the action taken, the creditor's name and address, the notice prescribed by 12 C.F.R. § 1002.9(b)(1), and either a statement of specific reasons for the action taken or a disclosure of the applicant's right to a statement of specific reasons. (15 U.S.C. § 1691(d)(2); 12 C.F.R. § 1002.9(a)(2).)

104. "Adverse action" includes "a refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered." (15 U.S.C. § 1691(d)(6); 12 C.F.R. § 1002.2(c)(1)(i).)

105. A "creditor" is any person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit, and includes a potential purchaser of the obligation who influences the credit





THE LAW OFFICES OF: ANDRE L. VERDUN

decision by indicating whether or not it will purchase the obligation if the transaction is consummated. (15 U.S.C. § 1691a(e); 12 C.F.R. § 1002.2(l) and Supp. I, cmt. 2(l)-1.)

106. Kind Lending is a creditor. Kind Lending issued the Lock Confirmation setting the loan amount, loan-to-value ratio, rate, and mortgage insurance terms; ran the automated underwriting; underwrote the file; made the credit decision, as Arvidson confirmed in writing on October 6, 2025; and set the terms of the counteroffers of October 2, 3, and 6, 2025, as Arvidson confirmed in writing on October 2, 2025.

107. Arbor is a creditor. Arbor is the lender named on the Closing Disclosures, the Promissory Note, and the Deed of Trust; took and processed the application; participated in the credit decision; and set terms of the counteroffers, including the lender credit of Three Thousand One Hundred Sixty-Five Dollars and Zero Cents ($3,165.00) offered on October 6, 2025.

108. Plaintiffs submitted a completed application no later than August 28, 2025, when Arbor confirmed that all conditions had been received. Defendants approved the application and then, on October 2 through 6, 2025, refused to grant credit in substantially the amount requested and instead made counteroffers of Six Hundred Thirty Thousand Four Hundred Dollars and Zero Cents ($630,400.00) and Six Hundred Eighty Thousand Dollars and Zero Cents ($680,000.00). Plaintiffs expressly declined the counteroffers on October 7, 2025.

109. Defendants took adverse action on Plaintiffs' application and failed to provide Plaintiffs with any written notice of adverse action, statement of specific reasons, or ECOA notice within ninety (90) days after the counteroffers, or at any time. Defendants likewise failed to provide a written notice of the counteroffers containing the disclosures required by Regulation B. The revised Closing Disclosures and Arvidson's emails do not satisfy 12 C.F.R. § 1002.9(a)(2) or



THE LAW OFFICES OF: ANDRE L. VERDUN

THE LAW OFFICES OF: ANDRE L. VERDUN

(b)(1).

110. As a direct and proximate result of Defendants' violations, Plaintiffs suffered actual damages as alleged above, including the costs and delay of pursuing substitute financing without a statement of the reasons for the adverse action. Pursuant to 15 U.S.C. § 1691e(a), (b), and (d), Plaintiffs are entitled to actual damages, punitive damages of up to Ten Thousand Dollars and Zero Cents ($10,000.00) against each creditor Defendant, and the costs of this action together with reasonable attorney's fees.

## EIGHTH CAUSE OF ACTION

## Violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq.

## (Against Arbor)

111. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

112. The Consumers Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." (Cal. Civ. Code § 1770(a).) "Services" means "work, labor, and services for other than a commercial or business use." (Cal. Civ. Code § 1761(b).) The CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices." (Cal. Civ. Code § 1760.)

113. Plaintiffs sought and acquired Arbor's work and labor: the services of a licensed mortgage broker in canvassing investors, evaluating Plaintiffs' qualification, structuring the refinance, arranging a loan with a third-party investor, coordinating underwriting and mortgage insurance approval, preparing and delivering disclosures and closing documents, and coordinating the closing

THE LAW OFFICES OF: ANDRE L. VERDUN

with escrow. Plaintiffs paid for those services, directly through the appraisal fee and the closing costs paid before closing and indirectly through the pricing of the loan and the compensation Arbor expected from the investor, and Arbor performed the services for Plaintiffs' personal, family, and household purposes. Those brokerage services are "services" within the meaning of section 1761(b), separate from the loan itself. The Legislature has confirmed that mortgage brokers and lenders are subject to the CLRA by regulating the conduct of mortgage brokers and lenders in section 1770(b).

114. Plaintiffs are "consumers" within the meaning of section 1761(d), Arbor is a "person" within the meaning of section 1761(c), and the engagement of Arbor's brokerage services was a "transaction" within the meaning of section 1761(e).

115. Arbor violated section 1770(a)(5) by representing that its brokerage services, and the loan those services had arranged, had the approval, characteristics, and benefits of an available, locked, properly underwritten, mortgage-insurance-approved, cleared-to-close loan ready to fund at 95 percent loan-to-value, when the loan had none of those characteristics.

116. Arbor violated section 1770(a)(7) by representing that its brokerage services were of the standard and quality of services that produce an insurable, saleable, fundable loan, when the services had produced a loan misclassified for mortgage insurance and investor purposes that could not be insured or sold as structured.

117. Arbor violated section 1770(a)(14) by representing, through the executed loan documents and the Addendum to Closing Instructions, that the transaction conferred on Plaintiffs the right to receive the loan proceeds upon satisfaction of "THE ENTIRE LIST OF FUNDING CONDITIONS," when Arbor maintained undisclosed conditions, issuance of a mortgage insurance certificate

and acceptance of the loan by an investor, that Arbor later invoked to withhold funding.

118. Arbor violated section 1770(a)(16) by representing, from July 29 through September 29, 2025, that the loan was being, and had been, supplied in accordance with its prior representations of availability, approval, clearance, and readiness to fund, when it had not been.

119. Plaintiffs relied on Arbor's representations and suffered damage as a result, including the appraisal fee, the closing costs paid before closing, the insurance premium, the costs of substitute financing, and the other losses alleged above.

120. Plaintiffs have complied with California Civil Code section 1782 as alleged above. Pursuant to California Civil Code section 1780(a), Plaintiffs are entitled to actual damages, an order enjoining the methods, acts, and practices alleged herein, restitution, punitive damages, and any other relief the Court deems proper. Pursuant to section 1780(e), Plaintiffs are entitled to court costs and attorney's fees.

121. Plaintiffs seek an order enjoining Arbor from quoting, locking, or disclosing a residential mortgage loan under a refinance classification that does not match the transaction the borrower has requested; from representing that a residential mortgage loan is approved, cleared to close, or ready to fund before the investor and mortgage insurer have approved the loan as structured; from releasing final loan documents for execution before all approvals on which funding depends have been obtained; from representing that a list of funding conditions is complete when undisclosed conditions exist; and from issuing Closing Disclosures that state mortgage insurance terms for insurance that has not been arranged.





THE LAW OFFICES OF: ANDRE L. VERDUN

THE LAW OFFICES OF: ANDRE L. VERDUN

## NINTH CAUSE OF ACTION

## Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.

## (Against Arbor and Kind Lending)

122. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

123. California Business and Professions Code section 17200 prohibits any unlawful, unfair, or fraudulent business act or practice.

124. Unlawful prong. Arbor's conduct violates the unlawful prong because it violates California Financial Code section 22161(a), (f), and (g), as alleged above; the CLRA as alleged in the Eighth Cause of Action; California Civil Code section 2923.1 as alleged in the Fourth Cause of Action; California Business and Professions Code section 10176(a) and (b), which prohibit a real estate licensee from making any substantial misrepresentation or any false promise of a character likely to influence, persuade, or induce; and the ECOA as alleged in the Seventh Cause of Action. Kind Lending's conduct violates the unlawful prong because it violates the ECOA as alleged in the Seventh Cause of Action.

125. Unfair prong. Arbor's and Kind Lending's conduct violates the unfair prong because the harm to Plaintiffs and to consumers outweighs any utility of the conduct, and the conduct offends established public policy. It is unfair to quote, classify, lock, price, approve, and document a residential mortgage loan under a classification that makes the loan uninsurable and unsaleable; to represent that loan as cleared to close and to obtain the borrowers' signatures on a note and deed of trust; to withdraw the approval after the rescission period has expired; and to offer the borrowers only a smaller loan as the remedy for the lender's own error. Kind Lending participated in, directed, and ratified Arbor's conduct by pricing, underwriting, and locking the loan as a limited cash-out

THE LAW OFFICES OF: ANDRE L. VERDUN

refinance, by directing the restructuring through its account executive on October 2, 2025, and by setting the terms of the counteroffers.

126. Fraudulent prong. Arbor's and Kind Lending's conduct violates the fraudulent prong because members of the public are likely to be deceived by a quote and rate lock for a loan that cannot be made as described, by a Closing Disclosure that states a monthly mortgage insurance premium for insurance that has not been arranged, by a clear-to-close representation issued before the lender has confirmed that the loan can be insured and funded, and by closing instructions that describe an incomplete list of funding conditions as the entire list.

127. Plaintiffs have suffered injury in fact and have lost money or property as a result of the unfair competition, including the appraisal fee, the closing costs paid before closing, the insurance premium, and the other sums alleged above.

128. Pursuant to California Business and Professions Code section 17203, Plaintiffs are entitled to restitution of all money acquired from Plaintiffs by means of the unfair competition and to an injunction prohibiting the practices alleged herein. Plaintiffs are entitled to attorney's fees pursuant to California Code of Civil Procedure section 1021.5 to the extent this action enforces an important right affecting the public interest and confers a significant benefit on the general public or a large class of persons.

**TENTH CAUSE OF ACTION**

**Negligence (Pleaded in the Alternative)**

**(Against Arbor and Kind Lending)**

129. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

130. This cause of action is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2), to the extent the Court determines that no

The Law Offices of: Andre L. Verdun

contract between Plaintiffs and Arbor governs the funding of the loan.

131. Arbor, as a licensed mortgage broker whose involvement exceeded the role of a mere lender of money, owed Plaintiffs a duty to exercise reasonable care in quoting, classifying, arranging, processing, and documenting the loan, including a duty not to represent the loan as available and locked on terms that did not exist for the transaction requested, not to represent the loan as cleared to close, and not to direct execution of final loan documents before confirming that the loan could be insured and funded as structured.

132. Kind Lending, which locked, priced, underwrote, and approved the loan, directed the mortgage insurance classification, and communicated its approvals and conditions to Plaintiffs through Arbor, owed Plaintiffs a duty to exercise reasonable care in classifying and underwriting the loan. The transaction was intended to affect Plaintiffs; harm to Plaintiffs from an approval that could not be funded was foreseeable and certain; the injury is closely connected to Kind Lending's conduct; Kind Lending's conduct is blameworthy; and the policy of preventing future harm favors recognition of the duty. Kind Lending is not in contractual privity with Plaintiffs.

133. Arbor and Kind Lending breached the duties alleged above, and Arbor breached its duty to train and supervise Hunjadi in the classification of refinance transactions and the confirmation of underwriting and mortgage insurance approvals before representing a loan as available, locked, or cleared to close.

134. As a direct and proximate result, Plaintiffs suffered the damages alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Tran Thuy Le and Tory Le pray for judgment against each Defendant as follows:

THE LAW OFFICES OF: ANDRE L. VERDUN

**On the First, Second, Third, and Fourth Causes of Action (against Arbor, Arvidson, and Hunjadi):**

1. For actual and consequential damages according to proof;

2. For damages for emotional distress according to proof;

3. Pursuant to California Civil Code section 3294, for punitive and exemplary damages on the Second, Third, and Fourth Causes of Action;

**On the Fifth and Sixth Causes of Action (against Arbor):**

4. For contract damages according to proof, including the cost of substitute financing, carrying costs, out-of-pocket expenses, and foreseeable consequential damages; or, in the alternative, expectation or reliance damages under the doctrine of promissory estoppel;

5. Pursuant to California Civil Code section 3287, for prejudgment interest;

6. Pursuant to California Civil Code section 1717, for attorney's fees to the extent provided by the parties' agreement;

**On the Seventh Cause of Action (against Arbor and Kind Lending):**

7. Pursuant to 15 U.S.C. § 1691e(a), for actual damages;

8. Pursuant to 15 U.S.C. § 1691e(b), for punitive damages of up to Ten Thousand Dollars and Zero Cents ($10,000.00) against each Defendant;

9. Pursuant to 15 U.S.C. § 1691e(d), for the costs of this action and reasonable attorney's fees;

**On the Eighth Cause of Action (against Arbor):**

10. Pursuant to California Civil Code section 1780(a)(1), for actual damages;

11. Pursuant to California Civil Code section 1780(a)(2), for an injunction as described above;

12. Pursuant to California Civil Code section 1780(a)(3), for restitution;

13. Pursuant to California Civil Code section 1780(a)(4), for punitive damages;

14. Pursuant to California Civil Code section 1780(e), for court costs and attorney's fees;

**On the Ninth Cause of Action (against Arbor and Kind Lending):**

15. Pursuant to California Business and Professions Code section 17203, for restitution and for preliminary and permanent injunctive relief as described above;

16. Pursuant to California Code of Civil Procedure section 1021.5, for attorney's fees;

**On the Tenth Cause of Action (against Arbor and Kind Lending):**

17. For actual damages according to proof;

**On all Causes of Action:**

18. For costs of suit;

19. For pre-judgment and post-judgment interest as allowed by law; and

20. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all causes of action and issues triable of right by jury.

Dated: September ___, 2026

**LAW OFFICE OF ANDRE L. VERDUN**

______________________________
Andre L. Verdun
Attorney for Plaintiffs
Tran Thuy Le and Tory Le



THE LAW OFFICES OF: ANDRE L. VERDUN